[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM RE: MOTION TO SET ASIDE THE VERDICT DATED AUGUST 1, 1995.
The Court, Pickett, J., directed a verdict for the New Milford Hospital, Raymond A. Mabassa, the surgeon and Yair Grinberg, the anesthesiologist on July 27, 1995. The reason for the granting of the directed verdicts in this case was because of the plaintiffs' failure to produce admissible expert testimony to support their burden of proof. Although the plaintiffs' have raised several evidential rulings in their motion to set aside the verdict dated August 1, 1995, the court has requested that the remaining two defendants, Dr. Raymond Mabassa and Dr. Yair Grinberg, submit briefs on the ruling of the court that the plaintiffs had not qualified their expert witness, Gerald S. Weinberger, to testify as an expert witness in this case. At the outset, it should be noted that directed verdicts were rendered in favor of all three defendants in this case after the court determined that the plaintiffs' expert witness was not competent or qualified to testify in this case, based upon the voir dire examination of Dr. Gerald S. Weinberger and the plaintiffs have not challenged the court's decision on this issue as to the defendant Hospital and have in effect abandoned their claims as to the defendant Hospital.
The law in Connecticut is clear that the determination of the witnesses qualifications or competency to testify in a case is a preliminary question of fact for the court to decide. Handbook ofConnecticut Evidence, Tait LaPlante, 2nd Edition § 7.11 p. 158. There are two cases cited by the authors of this textbook on evidence which furnish the court with general principles of law that are applicable to this case. In State v. Vars, 154 Conn. 255-268 (1966) dealing with lay witness, the Supreme Court stated the governing principle of law as follows:
 "A question as to the competency of a witness `is a matter peculiarly within the discretion of the trial court and its ruling will not be disturbed unless in a clear case of abuse or of some error in law.' State v. Orlando, 115 Conn. 672, 675, 163 A. 256; see State v. Segerberg, 131 Conn. 546, 41 A.2d 101; 3 Wigmore, Evidence (3d Ed.) § 931; notes, 26 A.L.R. 1491, 148 A.L.R 1140. `The trial court is generally in a better position to judge the competency of the witness than the appellate CT Page 11907 court . . . and will not be reversed unless clearly and manifestly wrong.' (Citation omitted) Vars, supra, p. 268.
In the case of Dunn v. Finley, 151 Conn. 618-621 (1964), dealing with expert witnesses, the Connecticut Supreme Court found no error in the court's denial of the plaintiff's motion to set aside the verdict and stated in part that:
 "The plaintiff was unable to qualify two witnesses as experts in the design and construction of diving towers, since neither of them had previous experience in that regard. One had designed platforms on dry land, and the other hand sold swimming pools. The court did not abuse its discretion in excluding their testimony as experts." Oborski v. New Haven Gas Co., 151 Conn. 274-280, 197 A.2d 73; Sears v. Curtis, 147 Conn. 311, 314, 160 A.2d 742." Finley, p. 621.
In this case the plaintiffs' attorney filed a Supplemental Response to Defendant's Interrogatories dated October 8, 1992 and November 16, 1992 by pleading dated December 1, 1993 and disclosed Gerald S. Weinberger, M.D. as an expert witness. The requested disclosure of the plaintiffs' expert witness essentially paraphrased the information subject to discovery under § 220 of the Superior Court Rules.
In part, the plaintiffs' attorney disclosed the following information about Dr. Weinberger:
 "Dr. Weinberger will testify concerning the claims of negligence being made against the defendants, specifically the claim in regard to the ulnar nerve injury suffered by the plaintiff as the result of the surgery of June 20, 1990.
 It is anticipated that Dr. Weinberger will testify that the defendants deviated from the accepted standard of care and not properly protecting the ulnar nerve in the plaintiff's right arm during the course of his cholecystectomy of June 20, 1990 and that as a result thereof, he developed an injury to the ulnar nerve. . . ."
On July 27, 1995 the attorney representing the defendant CT Page 11908 Hospital asked for and was granted the right to conduct a voir dire examination of Dr. Weinberger.
The voir dire examination by Mr. Anderson, the attorney representing the Hospital commences on page 23 of the July 27, 1995 transcript and concludes on page 26. The answers given by Dr. Weinberger to the voir dire examination by Attorney Anderson clearly supports the court's ruling that he was not qualified to testify as an expert witness in this case against the defendants.
"VOIR DIRE EXAMINATION BY MR. ANDERSON:
Q Doctor Weinberger, have you and I met one time before?
A That's correct.
Q Back down in, I think, it was Bridgeport?
A That's correct, sir.
Q I just want to ask you, Doctor Weinberger, a few questions regarding your experience and qualifications and so forth, okay?
A Certainly.
Q You are an anesthesiologist, correct?
A That's correct, sir.
Q And you are board certified in that field?
A Yes sir.
Q You are not board certified in any other field, correct?
A That's correct, sir.
Q And you are not a neurologist?
A That is very correct.
Q And a neurologist, if I understand correctly, Doctor Weinberger, is a physician who specializes in the treatment of illnesses to the nervous system and/or nerve injuries? CT Page 11909
A I think that is a reasonable summary.
Q Okay. And Doctor Weinberger, is it correct that you have never treated a patient with an ulnar neuropathy like the plaintiff in this case?
A That's correct. I have treated sympathetic dystrophies which can be related to nerve injuries, but I never treated specifically an ulnar neuropathy?
A I have never had a patient who had an ulnar neuropathy as one of my patients. I wouldn't be making the diagnosis. It would be made by a neurologist. I might have suspected a diagnosis like that on another patient, but I wouldn't actually make the final diagnosis.
Q All right. And that is because a neurologist is the person who is specially trained in doing that?
A That's correct, sir.
Q Okay. And you don't, as an anesthesiologist. I take it you don't perform or interpret nerve conduction studies or EMG tests, correct?
A That's correct.
Q And you have never published an article or medical article on ulnar neuropathy, is that correct?
A That is quite correct, sir.
Q Now am I also correct that it is not part of your job as an anesthesiologist to determine the etiology, or cause of a patient's neuropathies, polyneuropathies, median neuropathies?
A Well, we might, you know, if you had a patient who developed that type of injury, postoperatively, you might suspect an injury, you might make a preliminary diagnosis, but you would ultimately send a patient to a neurologist for a definite diagnosis.
Q But that is not my question, Doctor Weinberger. As an anesthesiologist over the years at Columbia Presbyterian and before that, it has not been part of your job to determine the cause for neuropathies, correct, in patients? That is something that a CT Page 11910 neurologist does?
A All right, yeah. I would agree with that.
Q Now leaving aside, Doctor Weinberger, things that anesthesiologists may or may not do, for example, positioning a patient's arms or extremities, leaving aside that as a cause for neuropathies, would I be correct that it is not within your field of expertise to discuss other causes for neuropathies, because that would be more appropriately addressed by a neurologist?
A I think that is correct, sir.
Q And as examples, Doctor Weinberger, you don't know, for example, whether an occupation that requires repetitive movement of the right arm or elbow could cause ulnar neuropathy, right?
A That's correct.
Q And you don't know whether if such an occupation that requires repetitive movement of the right arm does cause ulnar neuropathy, you wouldn't know like wise when the symptoms would start in that case, right?
A That would not be within my field or expertise, that is correct?
Q And you don't know whether repetitive trauma to the elbow can cause ulnar neuropathy, right? Because again, that is not in your area?
A No again, I wouldn't be an expert. That would probably be part of just general medical knowledge. But I am certainly not an expert in that.
Q And likewise, Doctor Weinberger, you wouldn't know whether shingles could cause ulnar neuropathy, right?
A Well, again, general knowledge I would know that herpes can cause damage to a nerve and ulnar neuropathy merely means you have damage to the nerve. But again, I would not be an expert in that field.
Q And am I correct, Doctor Weinberger, that all of those questions regarding whether these other things caused ulnar CT Page 11911 neuropathies or not are not within your field of specialty? They are in the field of neurology?
A I think that is correct, yes, sir.
 MR. ANDERSON: Your Honor, I would like to make a motion, if I could.
 MS. BARRETT: Your Honor, perhaps I can ask my questions first, and —
THE COURT: Go ahead.
MS. BARRETT: — then we will address motions.
THE COURT: Go ahead.
VOIR DIRE EXAMINATION BY MS. BARRETT:
Q Doctor, we have also met at your deposition?
A That's correct.
Q I represent Doctor Mabassa, the surgeon. You are not a surgeon, correct?
A That's correct.
Q You have no training as a surgeon?
A That is quite correct.
Q You don't claim to be an expert in any field, other than anesthesia, correct?
A That is quite correct.
Q So you don't feel qualified to testify against a surgeon, do you?
A That is correct, except that insofar as positioning a patient is a combined responsibility of the surgeon and the anesthesiologist. Other than that, no. Certainly not within the field, specific field, of surgery. CT Page 11912
Q You certainly can't make any criticisms against any behavior of the surgeon?
 MR. DAVID COONEY: I object, your Honor. He has already indicated in one limited respect, which is the issue in this case that he can.
BY MS. BARRETT:
Q You certainly wouldn't criticize Doctor Mabasa's gallbladder operation?
A That is quite correct.
MS. BARRETT: Thank you. No further questions.
THE COURT: Mr. Cooney?
VOIR DIRE EXAMINATION BY MR. ROBERT COONEY:
Q Doctor, you have no factual data at all about the positioning of this particular patient, isn't that true?
 MR. DAVID COONEY: I object, your Honor. That is beyond —
 MR. ROBERT COONEY: I will withdraw the question. Forget about it.
MR. DAVID COONEY: That is beyond his qualifications.
 THE COURT: Anything further? Ladies and gentlemen, you may be excused at this time.
(The jury was excused)
(Colloquy was had between court and counsel)
(The jury returned to the jury box)
 MR. DAVID COONEY: May I proceed at this point, Your Honor."
July 27, 1995 transcript of a portion of the testimony of Dr. Weinberger, pp. 23-28. CT Page 11913
Dr. Weinberger's testimony clearly indicated that he never treated a patient with an ulnar neuropathy such as the plaintiff has in this case, nor has he ever diagnosed a patient with ulnar neuropathy. He stated unequivocally that he "never had a patient who had an ulnar neuropathy as one of my patients." Dr. Weinberger further agreed that it was not his job to determine the causes for neuropathies; rather, that was something a neurologist does. Moreover, Dr. Weinberger testified that it was not within his field of expertise concerning an ulnar neuropathy that was caused by an occupation that required repetitive movement of the right arm. There was significant evidence produced at the trial of this case that the plaintiff had an occupation that required repetitive movement of the right arm and there was testimony from the two treating physicians in the case that such repetitive movement can cause ulnar nerve injuries.
The transcript of the July 27, 1995 testimony of Dr. Weinberger demonstrates clearly that the court allowed the plaintiff's attorney a full and fair opportunity to show whether Dr. Weinberger had the expertise to render an admissible opinion in this case on cause of the ulnar neuropathy. See, David v. Margolis,215 Conn. 408-417 (1990). In response to a question asked of Dr. Weinberger by the court after the voir dire examination had been concluded and after the offers of proof had been concluded, Dr. Weinberger clearly stated that he would be merely speculating or guessing as to the cause of the ulnar nerve injury.
The court noted in its decision to grant the defendant's request for a directed verdict that "He (referring to Dr. Weinberger) is not qualified to testify by his own admission as to what caused the injury." (Transcript p. 43) Based upon the review of the transcript of Dr. Weinberger's testimony on July 27, 1995 and in particular the responses to the questions asked of him by Attorney Anderson who represented the Hospital, it is perfectly clear that the trial court did not abuse its discretion in excluding the testimony of Dr. Weinberger because Dr. Weinberger's own testimony makes it clear that he was not qualified to render an admissible opinion on the cause of the ulnar neuropathy. Rodriguezv. Petrilli, 34 Conn. App. 871-876 (1994). The Petrilli case involved a dental malpractice action and the Appellate Court held that the trial court properly excluded the expert testimony of the plaintiff's only expert witness and that the direction of a verdict for the defendant was indeed proper in that case. It is interesting to note that the plaintiff's attorneys' do not rely CT Page 11914 upon the Petrilli case in its memorandum of law dated September 21, 1995, and it is understandable why they do not because it supports the defendants in this case.
The court's review of the record does support the finding that Dr. Weinberger was not qualified to render an admissible expert opinion in this case. The court's decision to preclude Dr. Weinberger on this basis and direct a verdict for the defendants in no way constituted an abuse of discretion.
For the foregoing reasons, the court denies the plaintiff's Motion to Set Aside the Verdict.
PICKETT, J.